## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MARTIN OZINGA III, MARTIN OZINGA IV, KARL OZINGA, JUSTIN OZINGA, AARON OZINGA, PAUL OZINGA, TIMOTHY OZINGA, JEFFREY OZINGA, and OZINGA BROS., INC,** an Illinois corporation, | ) ) ) ) ) ) ) ) ) | No._____ |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | |
| **UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; KATHLEEN SEBELIUS,** in her official capacity as Secretary of the U.S. Department of Health & Human Services; **UNITED STATES DEPARTMENT OF THE TREASURY; JACOB J. LEW,** in his official capacity as the Secretary of the U.S. Department of the Treasury; **UNITED STATES DEPARTMENT OF LABOR; and SETH D. HARRIS,** Deputy Secretary of Labor, in his official capacity as Acting Secretary of the U.S. Department of Labor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** **Jury Demanded** **On All Issues So Triable** |
| **Defendants.** | ) | |

NOW COMES Plaintiffs Martin Ozinga III, Martin Ozinga IV, Karl Ozinga, Justin Ozinga, Aaron Ozinga, Paul Ozinga, Timothy Ozinga, Jeffrey Ozinga, and Ozinga Bros., Inc, an Illinois Corporation (hereafter "Plaintiffs"), by and through undersigned counsel, and complain of the above-named Defendants the United States Department Of Health & Human Services; Kathleen Sebelius, in her official capacity as Secretary of the U.S. Department of Health &

Human Services; the United States Department of the Treasury; Jacob J. Lew, in his official capacity as the Secretary of the U. S. Department of the Treasury; the United States Department of Labor; and Seth D. Harris, Deputy Secretary of Labor, in his official capacity as Acting Secretary of the U.S. Department of Labor, (collectively, the "Defendants"), their employees, agents and successors in office, as follows:

<u>**Nature of the Case**</u>

1.      This case seeks to preserve and protect the foundational rights of a citizenry in a democratic republic, namely to freely exercise their most deeply held religious convictions in their daily lives, including in their freely chosen life's work and vocation, or as Thomas Jefferson stated early in the life of our American Republic, "to protect the rights of conscience against the enterprises of the civil authority."[1]

2.      Throughout their management of their family business, individual plaintiffs have made open and manifest the importance of their Christian beliefs to exactly how they conduct that business. Plaintiffs sue for declaratory and injunctive relief, to cease, redress, and repair the Defendants' grave and ongoing infringement of Plaintiffs' fundamental human right, guaranteed under the First Amendment of the United States Constitution, as well as their statutory rights arising under other provisions of federal law hereinafter alleged, to continue to engage in the free and robust exercise of their religious beliefs, in strict and faithful adherence to the deepest

---

[1] Thomas Jefferson to the Society of the Methodist Episcopal Church of New London (February 4, 1809), in XV The Writings of Thomas Jefferson, at 331-332 (Albert Ellery Bergh, ed., Thomas Jefferson Memorial Assoc. 1907 (1905). *See:* (http://books.google.com/books?id=4zhLAAAAYAAJ&pg=RA1-PA332&lpg=RA1-PA332&dq=Jefferson+%22against+the+enterprises+of+the+civil+authority.%22&source=bl&ots=CUV7pK2P0X&sig=GfyneCww1NCa_vdpV5Jg_AMO7dI&hl=en&sa=X&ei=hrh2UZCKE4mpqgG544GoDw&ved=0CFEQ6AEwBg#v=onepage&q=Jefferson%20%22against%20the%20enterprises%20of%20the%20civil%20authority.%22&f=false)

dictates of their private conscience as expressed through the religious dimension of their family's corporate mission.

3.    More specifically, all nine plaintiffs, as the eight individual co-owners and senior managers of their privately owned close corporation and as the corporation itself, through which the plaintiffs affirm and embrace a solemn conviction and belief at the heart of their Christian faith, seek to preserve and to protect the foundational ethos of their corporate enterprise, namely that as devout Christians they are in business to serve their customers, their community, their co-workers and their Creator.

4.    As detailed herein, the federal statutory scheme of which Plaintiffs herein complain has its origins in the "Patient Protection and Affordable Care Act," (Public L. 111-148, March 23, 2010, 124 Stat. 119) *amended by the* "Health Care and Education Reconciliation Act of 2010" (Public L. 111-152, March 30, 2010, 124 Stat. 1029) (hereafter collectively "ACA"). Pursuant to the ACA, Defendants now are purporting to force Plaintiffs to put aside, override, ignore and suppress their conscientious beliefs about what is right and what is fundamentally, and grievously wrong, and which thus also grossly disserves the health and welfare of the employees of Ozinga Bros., Inc.,  including members of the individual plaintiffs' own families.

5.    The ACA regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

6.    The ACA does not apply equally to all insurers.

7.    The ACA does not apply equally to all individuals.

8.    The ACA requires employers with more than 50 full-time employees or full-time employee equivalents to provide federal government approved health insurance or pay a substantial per-employee fine. (26 U.S.C. § 4980H).

9.      Section 2713 of the Public Health Services Act, enacted through the ACA, through a mandate from the United States Department of Health and Human Services, purports to require Plaintiffs to "provide coverage for and [not charge for] with respect to women, such additional preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of the U. S. Department of Health and Human Services to determine what would be "preventative care" under the mandate. 42 U.S.C. § 300gg-13(a)(4).

10.     Without notice of rulemaking or opportunity for public comment, the United States Department of Health and Human Services, the United States Department of Labor and the United States Department of the Treasury adopted the Institute of Medicine ("IOM") recommendations in full, and promulgated an interim final rule, which requires that all "group health plan[s] and. . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA approved contraceptive methods and procedures.   76 Fed. Reg. 46621 (published August 3, 2011); 45 C.F.R. § 147.130 (the "Mandate").

11.     The Health Resources and Services Administration, also created under ACA, also issued guidelines adopting the IOM recommendations (http://www.hrsa.gov/womensguidelines).

12.     Under these IOM "guidelines," the Mandate purports to require *all* insurance providers to provide not only contraception but also abortion because certain drugs and devices such as the "morning after" pill, "plan B," and "ella" come within the Mandate's and Health Resources and Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known and publicly documented abortifacient mechanisms

of action.[2]

13.     The Mandate thus forces employers and individuals, as Plaintiffs, to violate their religious beliefs by requiring employers and individuals, as Plaintiffs, to pay for insurance from insurance issuers which fund and directly provide for drugs, devices and procedures which violate their deeply held religious beliefs.

14.     Since under the Mandate *all* insurance issuers must provide what the United States Department of Health and Human Services defines as "preventative care," employers and individuals are deprived of any right to choose insurance issuers or insurance plans to avoid violating their religious beliefs.

15.     The result of these undertakings by the United States Department of Health and Human Services is to force religious employers and individuals, who believe that funding and providing for  abortion and abortifacients is wrong, and to participate in acts that violate their consciences, or to be forced out of the health insurance market altogether in order to act in accord with their religious beliefs.

16.     Plaintiffs seek a preliminary injunction and permanent injunction, enjoining Defendants from implementing and enforcing provisions of the regulations promulgated under the ACA, specifically the Mandate, on the grounds, among others, that the Mandate violates their Free Exercise, Free Speech and Due Process Rights under the Bill of Rights of the United States Constitution, under the Religious Freedom Restoration Act, and under the Administrative Procedure Act.

17.     Plaintiffs also seek a declaratory judgment that the regulations promulgated under

---

[2] Regarding the abortifacient effect of these contraceptives, *see e.g.*:  http://www.ella-rx.com/; http://planbonestep.com/faqs.aspx?MTD=2&CPN=2&utm_source=bing&utm_medium=cpc&utm_term=what's%20plan%20b&utm_campaign=Branded; http://www.drugs.com/mtm/preven-ec.html.

the ACA, specifically the Mandate, on the grounds that the Mandate violates their Free Exercise, Free Speech and Due Process Rights under the Bill of Rights of the United States Constitution, under the Religious Freedom Restoration Act, and under the Administrative Procedure Act.

18.     The ACA's abortion and abortifacient contraception Mandate violates the rights of Plaintiff Ozinga Bros., Inc., and its individual owners and senior managers plaintiffs Martin Ozinga III, Martin Ozinga IV, Karl Ozinga, Justin Ozinga, Aaron Ozinga, Paul Ozinga, Timothy Ozinga and Jeffrey Ozinga.

19.     Plaintiffs, Martin Ozinga III, Martin Ozinga IV, Karl Ozinga, Justin Ozinga, Aaron Ozinga, Paul Ozinga, Timothy Ozinga and Jeffrey Ozinga are faithful adherents of the Christian faith.   As such, each believes that the inherent dignity, and indeed the inviolable sanctity, of each and every human being rests ultimately on the immutable truth that each person has been *created* in the image and likeness of God, before whom they stand as equals, endowed with inalienable rights.

20.     Consequently, each also believes that the life of every human being must be protected, cherished, and fostered from the moment of his or her conception until natural death. That the federal government would now coerce Plaintiffs to flout their  most profoundly personal and fundamental religious beliefs flies in the face of repeated declarations of the Founding Fathers and also runs wholly counter to the thrust of our modern Supreme Court jurisprudence to the effect that, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion *or force citizens to confess by word or act their faith therein* [and] if there are any circumstances which permit an exception, they do not now occur to us." *West Virginia Bd. of Education v. Barnette,* 319 U.S. 624, 642 (1943) *(emphasis added).*

21.      By reason of their religious conviction Plaintiffs sincerely believe that they cannot facilitate access to, subsidize, or materially cooperate with the provision of the offensive procedures and drugs described herein without breaching their solemn and sacred obligations to God, betraying their professed religious faith, and disserving the best interests of – as well as risking serious physical and/or spiritual injury to – their fellow human beings.

22.      The individual plaintiffs own, manage and control the corporate plaintiff, Ozinga Bros., Inc., a privately held Illinois corporation (hereafter "Ozinga Bros."). Unless the context indicates otherwise, "Plaintiffs" hereafter refers collectively to the Ozinga family members named, and Ozinga Bros.

23.      Plaintiffs believe that their religious faith, which shapes and determines their understanding of the importance and meaning of their lives, must inform all of their actions, including their actions as directors, officers, managers and owners of Ozinga Bros., in order for them to live fully integrated lives which provide for Christian witness to those around them.

24.      By this action Plaintiffs seek only to be allowed to continue to conduct their business, as they have since the company was first wholly owned and controlled by the Ozinga family, some 85 years ago, in a manner that does not violate the principles of their religious faith relating to the sanctity of human life, and the inherent dignity of the individual person.

25.      To the end of continuing to freely exercise their religious faith and free speech and associational rights in this way, as have three previous generations of the Ozinga family, Plaintiffs have filed this lawsuit, seeking judicial review of the Defendants' violations of the constitutional and statutory provisions described below and in connection with the Defendants' promulgation and implementation of the above complained of regulations under the ACA.

26.      By purporting to force Plaintiffs to provide their employees, including members

of their own families, with access to drugs and procedures to which they object by reason of their sincerely held religious convictions, these federal regulations operate together to violate their legal rights, including the fundamental rights to the free exercise of religion, free speech and association guaranteed by the Constitution of the United States of America, as well as their rights under the other federal statutes herein relied upon.

## Jurisdiction and Venue

27.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1346, 1361, and 1367, as this action is one in which the United States is a defendant, and also one which arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§2201, 2202 and 42 U.S.C. §2000bb-1.

28.     Plaintiffs' claims for declaratory and preliminary and permanent injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C §2000bb-1, and pursuant to the general legal and equitable powers of this Court.

29.     Venue is appropriate in this district pursuant to 28 U.S.C. §1391(e) (1), as seven of the eight individual plaintiffs reside and are located within this District, and Ozinga Bros. has its principal place of business in the District.

30.     Plaintiff Martin Ozinga III resides in the Northern District of Illinois, in Will County, Illinois, and is a director and the Chairman of Ozinga Bros.

31.     Plaintiff Martin Ozinga IV resides in the Northern District of Illinois, in Cook County, Illinois, and is a director and the President of Ozinga Bros.

32.     Plaintiff Karl Ozinga resides in Orange County, California and is a director and a Vice President of Ozinga Bros.

33.     Plaintiff Justin Ozinga resides in the Northern District of Illinois, in Will County, Illinois, and is a director and a Vice President of Ozinga Bros.

34.     Plaintiff Aaron Ozinga resides in the Northern District of Illinois, in DuPage County, Illinois, and is a director and a Vice President of Ozinga Bros.

35.     Plaintiff Paul Ozinga resides in the Northern District of Illinois, in Cook County, Illinois and is a director and Vice-President of Ozinga Bros.

36.     Plaintiff Timothy Ozinga resides in the Northern District of Illinois, in Will County, Illinois and as a director and a Vice President of Ozinga Bros.

37.     Plaintiff Jeffrey Ozinga resides in the Northern District of Illinois, in Cook County, Illinois and is a director and a Vice President of Ozinga Bros.

38.     Martin Ozinga III, Martin Ozinga IV, Karl Ozinga, Justin Ozinga, Aaron Ozinga, Paul Ozinga, Timothy Ozinga, and Jeffrey Ozinga own and control plaintiff, Ozinga Bros., Inc. an Illinois for-profit corporation with its headquarters and principal place of business at Mokena, Illinois also within the Northern District of Illinois.

39.     Martin Ozinga III, Martin Ozinga IV, Karl Ozinga, Justin Ozinga, Aaron Ozinga, Paul Ozinga, Timothy Ozinga, and Jeffrey Ozinga control all policies governing the conduct of all phases of business at Ozinga Bros. related to insurance coverage for the company's non-union employees.

40.     Ozinga Bros. is a closely held or "close" Illinois corporation, as that term is defined under Illinois law.

41.     Ozinga Bros. is registered at 19001 Old LaGrange Rd., Mokena, Illinois.

42.     Ozinga Bros. is treated as a Subchapter S corporation for income tax purposes.

43.     Defendant United States Department of Health and Human Services ("HHS"), is

an agency of the United States, and is responsible for administration and enforcement of the Mandate.

44.     Defendant Kathleen Sebelius is Secretary of HHS, and is named as a party defendant in her official capacity.

45.     Defendant United States Department of the Treasury is an agency of the United States, and is responsible for administration and enforcement of the Mandate.

46.     Defendant Jacob J. Lew is Secretary of the Treasury, and is named as a party in his official capacity.

47.     Defendant United States Department of Labor ("DOL") is an agency of the United States, and is responsible for administration and enforcement of the Mandate.

48.     Defendant Seth D. Harris, Deputy Secretary of Labor, is acting secretary of the U. S. Department of Labor and is named as a party in his official capacity.

## Factual Allegations

49.     Established some 85 ago, since virtually its creation plaintiff Ozinga Bros. has been and still is a family-owned company currently headquartered in Mokena, Illinois.  Ozinga Bros. maintains some 35 plants and facilities in Illinois, Indiana and Michigan, and employs about 675 persons, mostly in Illinois.  Ozinga Bros. is one of the largest privately owned ready mix concrete companies in the United States.

50.     Ozinga Bros. employs over 50 full-time employees or full time employee equivalents as defined under the ACA.

51.     The ACA purports not to apply to the failure to offer employer-sponsored insurance to employers with fewer than 50 employees, not counting seasonal workers. (26 U.S.C. § 4980H (c)(2)(A)).

52.    However, even employers with fewer than 50 employees purchase insurance from health insurers, who are subject to the ACA.  42 U.S.C. § 300gg-13 (a)(1), (4)).

53.    Ozinga Bros. constitutes a "single employer" as defined under the ACA (42 U.S.C. § 18024(b)(4)(A)).

54.    Plaintiffs must provide federal government approved health insurance under the ACA, or pay substantial per-employee fines.

55.    Some 540 of Ozinga Bros.'s employees are unionized, and receive their health insurance through and as a result of their collective bargaining agreements.

56.    Ozinga Bros. provides health insurance directly to its approximately 210 non-unionized employees, mostly administrative personnel.

57.    Ozinga Bros. currently provides group health insurance to its non-unionized employees through BlueCross/BlueShield of Illinois. Ozinga Bros.'s plan year commences annually, on the first of May.

58.    Ozinga Bros. was founded in 1928 as a coal yard.  The Ozinga family became sole owners of the company in 1929.

59.    Individual plaintiffs, the current owners and managers of Ozinga Bros. represent the third and fourth generation of Ozinga family ownership.  Martin Ozinga III, Martin Ozinga IV, Karl Ozinga, Justin Ozinga, Aaron Ozinga, Paul Ozinga, Timothy Ozinga and Jeffrey Ozinga all are devout Christians.

60.    Martin Ozinga III is a member of a non-denominational Christian church, located in Homer Glen Illinois.

61.    Martin Ozinga IV is a member of a non-denominational Christian church located in Chicago, Illinois.

62.     Paul Ozinga and Jeffrey Ozinga both are members of a non-denominational Christian church located in Chicago, Illinois.

63.      Justin Ozinga and Tim Ozinga both are members of a non-denominational Christian church located in Orland Park, Illinois.

64.     Aaron Ozinga is a member of a church located in Elmhurst, Illinois affiliated with the Christian Reformed Church denomination.

65.     Karl Ozinga is a member of a non-denominational Christian church located in Costa Mesa, California.

66.     Plaintiffs conduct Ozinga Bros. with the utmost integrity and in compliance with the teachings, mission and values of their Christian faith, as set forth in Scripture.

67.     Plaintiffs' values and religious beliefs are those reflected in the teachings of their Christian faith.

68.     Pursuant to and consistent with their Christian values and their religious beliefs, Plaintiffs are Pro-Life.

69.     Plaintiffs consider the providing of employee health insurance an integral component of furthering their personal corporate mission, by treating their employees well.

70.     In addition, plaintiffs reasonably believe that providing some level of benefits is a practical business necessity, and that the failure to do so would doom to inevitable failure Plaintiffs efforts to attract and retain quality employees which, in turn, would cripple and destroy their entire family owned business.

71.     The foundation of Plaintiffs' Christian values and religious beliefs is Scripture, their belief that Scripture alone is God's word to all mankind, and that its human authors under the guidance of the Holy Spirit wrote Scripture as the supreme source of truth for Christian

beliefs and living. *See:* Mathew 28:18-20 ("Then Jesus came to them and said, "All authority in heaven and on earth has been given to me. Therefore go and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you.").

72.     As a result of this Scriptural commission, Plaintiffs believe that their obligation to live their faith openly and directly in everything that they do, includes how they manage and operate Ozinga Bros., and how they treat Ozinga's employees, customers, and other "stakeholders." As one example of this, Plaintiffs routinely open and close business meetings at Ozinga Bros. with public prayer.

73.     Reflective of their sincerely held religious beliefs and the importance of those beliefs to how they conduct Ozinga Bros. business, the company's web site also makes direct and unequivocal references to the importance of Plaintiffs' faith in their everyday business activities. *See:* http://www.ozinga.com/about/, at "Documentary." (Martin Ozinga III: "We honor God by all that we do, and treat others the way we want to be treated." (speaking of the basis of the company's success); Martin Ozinga IV: Keeping an "ear to God's leading" is the key to Ozinga's continued success in the future.).  *See also*: http://bit.ly/Ozinga-HereToStay. (Jim Ozinga: "We're here to serve God and the crown of his creation, man;" Paul Ozinga: "This business is to honor and glorify God.")

74.     Plaintiffs also sincerely believe that their religious faith obligates tithing. *See:* Deuteronomy 14:22 ("Be sure to set aside a tenth of all that your fields produce each year."). *See also:* Genesis 14:20 ("The Abraham gave him a tenth of everything"); Genesis 28: 20-22 ("If God will be with me and will watch over me on this journey I am taking and will give me food to eat and clothes to wear so that I return safely to my father's household, then the Lord will be my

God and this stone that I have set up as a pillar will be God's house, and of all that you give me I will give you a tenth."); Luke 11:42 ("Woe to you Pharisees, because you give God a tenth of your mint, rue and all other kinds of garden herbs, but you neglect justice and the love of God. You should have practiced the latter without leaving the former undone.")

75.     Reflective of their sincerely held religious beliefs and the importance of those beliefs to how they conduct Ozinga Bros., Plaintiffs tithe annually an amount equal to at least 10% of the pre-tax income of the company to charitable works.

76.     As a result of this commitment to Scriptural tithing Plaintiffs have provided and continue to provide key significant material support for, and among other things, Christian educational institutions located in the Chicagoland area and elsewhere.

77.     As a result of this commitment to Scriptural tithing, Plaintiffs also are providing significant material support to private Christian health care internationally, including in Africa (Uganda) and in Europe (Romania), and in the Chicagoland area.

78.     The health clinic that Plaintiffs  support in Romania, in turn designates a portion of its profits to helping the poor, and has become Romania's "gold standard for health care as well as a model for businesses contending with a corruption-plagued political system."[3]

79.     Also reflective of their sincerely held religious beliefs, and the importance of those beliefs to how they conduct Ozinga Bros., the company also publicly emphasizes the importance of responsible environmental stewardship. As also reflected at the Ozinga Bros. site, and as a part of its "Ozinga Green Building" initiative, Plaintiffs profess publicly that "we are passionate about our charge to care for the earth." *See:* http://www.ozingagreenbuilding.com/, at tab "Our Philosophy."

---

[3] http://illinoisreview.typepad.com/illinoisreview/2008/08/ozinga-responds.html.

80.     The reference to the "charge to care for the earth" referenced in these Ozinga Green Building initiative materials is to God's charge to man as reflected in Scripture. *See:* Genesis 1:28 ("God blessed them and said to them, "Be fruitful and increase in number; fill the earth and subdue it. Rule over the fish in the sea and the birds in the sky and over every living creature that moves on the ground.); 2:15 ("The LORD God took the man and put him in the Garden of Eden to work it and take care of it.").

81.     To the Plaintiffs, Scripture not only requires that they live their lives openly, consistently, and correctly as Christians; Scripture also plainly and unequivocally teaches that human life is a sacred gift that comes from God, that God creates life, that life begins at conception and that we are to "choose life:"

Jeremiah 1: 4-5 ("Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee, and I ordained thee a prophet unto the nations.");

Psalm 139: 13-15 ("For you created my inmost being; you knit me together in my mother's womb. I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well. My frame was not hidden from you when I was made in the secret place, when I was woven together in the depths of the earth.");

Galatians 1:15 ("But when God, who set me apart before I was born and who called me by his grace, was pleased . . .");

Psalm 22: 10-11 ("From birth I was cast on you; from my mother's womb you have been my God."); and

Deuteronomy 30:19 ("This day I call the heavens and the earth as witnesses against you that I have set before you life and death, blessings and curses. Now choose life, so that you and your children may live and that you may love the LORD your God, listen to his voice, and hold fast to him. . . ").

82.     Plaintiffs therefore believe that by definition abortion, and abortifacient contraception involve the destruction of a human life, a creation of God, and that as a result all such abortion and abortifacient contraception is wrong and sinful, and therefore harmful to the spiritual and physical health and well-being of all human beings.

83. Plaintiffs therefore also believe that providing coverage for drugs and procedures that facilitate such wrong and sinful practices constitutes cooperation with such wrong and sinful conduct.

84. Plaintiffs purchase group health insurance through insurance issuer Blue Cross/ Blue Shield, of Illinois, and provide this insurance to their employees.

85. Pursuant to their sincerely held religious beliefs Plaintiffs strive to provide their employees with employee health coverage equal to, or superior to, coverage generally available in the Illinois/Indiana/Michigan market in order that Ozinga Bros. be a competitive employer.

86. Plaintiffs never requested coverage for abortion or abortifacient contraception, and were under the impression that the policies that they had did not provide their employees with access to these procedures or drugs.

87. As a result of media coverage of objections being raised by privately held closely held family businesses to providing abortion and abortifacient contraceptive coverage to their employees beginning in September 2012, Plaintiffs examined the extent to which the coverage provided at Ozinga Bros., if at all, included such offensive coverage.

88. Upon determining that it had historically provided such offensive coverage, in December 2012 Plaintiffs revised the coverage provided by their health insurance plan to remove abortion and abortifacient contraceptives from the plan coverage. Blue Cross/Blue Shield of Illinois has deemed that due to the Mandate, Plaintiffs will not be allowed to exclude abortion and abortifacient contraception from Ozinga Bros.' insurance plan and that Plaintiffs will be forced to provide and pay for those procedures which violate their religious beliefs.

89. Plaintiffs have been attempting to find, but without success, coverage compliant with the ACA and with their sincerely held religious beliefs.

90.     On information and belief, based on the company's investigation and the investigations of its insurance professionals, there is no such coverage available nor is there any reasonable likelihood of it becoming available under the ACA, as currently configured and construed.

91.     The Mandate complained of purports to require employers to provide coverage for the full range of FDA approved "contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."[4] The contraceptive methods for which coverage must be provided include abortion and abortifacient contraceptives. *Id.*

92.     Plaintiffs cannot provide, fund or participate in health care insurance which covers abortion or abortifacient contraception, or related education and counseling, without violating their deeply held religious beliefs.

93.     Plaintiffs cannot provide information or guidance to their employees regarding abortion or abortifacient contraceptives, or related education and counseling, without violating their deeply held religious beliefs.

94.     With full knowledge of these aforesaid beliefs, defendants issued the Mandate previously alleged that deliberately failed to take into any account whatsoever Plaintiffs' religious beliefs and the analogous beliefs of millions of their fellow citizens.

95.     If enforced, the Mandate coerces Plaintiffs to violate their religious beliefs by requiring them to provide Ozinga Bros. employees, including members of the families of the individual Ozinga plaintiffs themselves, with access to abortifacient contraception, including but without limitation drugs and devices such as the "morning-after pill," "Plan B," and "ella," all of

---

[4] http://www.hrsa.gov/womensguidelines/

which come within the Mandate's and HRSA's definition of "Food and Drug Administration-approved contraceptive methods" despite their known and admitted abortifacient mechanisms of action.[5]

96.    If enforced, the Mandate not only forces Plaintiffs to violate their religious beliefs as alleged; it also subverts the expression by Plaintiffs of their religious beliefs, and the beliefs of millions of their fellow Americans, by forcing them to fund, promote and to assist others to acquires procedures and drugs which Plaintiffs believe are wrong and sinful.

97.    To justify its "contraception mandate," Defendants argue that without employers like Plaintiffs providing such coverage, Ozinga Bros.'s employees will be without access to such drugs and procedures.

98.    Thus the government is, in form and in substance, insisting that the Plaintiffs directly participate in providing the wrong and sinful drugs and practices herein complained of.

99.    That is, as  a result of its Mandate, the government is forcing Plaintiffs to choose: they must either provide their employees with the benefits required by this pernicious legislation, refuse to provide employee benefits at all, or go out of business altogether.

100.    Plaintiffs reasonably believe that depriving their employees of benefits would cripple their business.

101.    Plaintiffs have no desire to go out of business and do not believe that they should be forced to choose between violating their sincerely held religious beliefs by engaging in wrongful and sinful conduct or shutting down their business.

102.    The ACA's Mandate is not generally applicable to all business entities.

103.    Defendants' refusal to accommodate the consciences of the Plaintiffs, and of other

---

[5] Regarding the abortifacient effect of these contraceptives, *see note 2, supra.*.

Americans who share Plaintiffs' religious views, is highly selective.

104.    Numerous exemptions exist in the ACA which appear arbitrary and were granted to employers who purchase group insurance.  This evidences that defendant do not mandate that all insurance plans need to cover "preventative services" (*e.g.* the thousands of waivers from the ACA issued by Defendants for group insurance based upon the commercial convenience of large corporations, the age of the insurance plan or the size of the employer, among other things).

105.    Despite granting waivers upon a seemingly arbitrary basis, no exemption exists for an employer or individual whose religiously formed conscience compels him or her to conclude that certain mandated drugs and procedures are unethical, immoral and in direct opposition to their religious beliefs.

106.    To date the government has not required every insurance plan in the country to provide for these procedures.  Instead it has exempted numerous persons and groups from compliance with various and sundry parts of the ACA, often for purposes of commercial or political convenience (including certain large fast food franchise operations; certain "not-for-profits" public interest organizations; and certain "religious" organizations, narrowly defined) or has allowed them additional time within which to seek compliance.

107.    As a result, Defendants' plan fails to give the same level of weight or accommodation to the exercise of one's fundamental First Amendment rights that it assigns to the yearly earnings and profitability of a corporation.

108.    To date the government refuses and resists giving any accommodation whatsoever to families like the Ozingas, who seek only to continue to operate their business, as they historically have always done, in accordance with their deeply held religious convictions.

109.    "Grandfathered" plans are exempt from the federal Mandate's preventative care

requirement. *See:* 29 CFR Part 2590 (June 17, 2010). As a result of this provision, the mandate is currently not in force as to more than 190 million individuals whose plans have been "grandfathered" under the provision.[6]

110. The Plaintiffs' plan is not considered "grandfatherd" and will be subject to the provisions of the Mandate.

111. Certain provisions of the ACA do not apply equally to members of certain kinds of religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(A)(i) and (ii) (individual mandate does not apply to members of "recognized religious sects or divisions" that conscientiously objects to acceptance of public or private insurance funds); 25 U.S.C. § 5000A(d) (2) (B) (ii) (individual mandates does not apply to members of "health care sharing ministry" that meets certain criteria).

112. Ozinga Bros. does not qualify for the "religious employer" exemption contained in 45 CFR § 147.130 (a)(1)(A) and (B).

113. Since Ozinga Bros. does not qualify as a "religious employer," Plaintiffs cannot take advantage of the "temporary safe harbor" as set forth by the Defendants at 77 Fed. Register 8725 (February 15, 2012).

114. The ACA is not neutral because some groups, both secular and religious, enjoy exemption from the law, while certain religious groups do not. Some groups, both secular and religious, have received waivers from complying with the provisions of the ACA, while others-- including Plaintiffs--have not.

---

[6] *Newland v. Sebelius*, 881 F.Supp.2d 1287, 1298, at n. 13 (D. Colo. 2012).

115.    The ACA creates a system of individualized exemptions.

116.    The United States Department of Health and Human Services has the authority under the ACA to grant compliance waivers ("HHS waivers") to employers and other health insurance plans.

117.    HHS waivers release employers and other plan issuers from complying with the provisions of the ACA.

118.    HHS decides whether to grant waivers based on individualized waiver requests from particular employees and other health insurance plan issuers.

119.    Upon information and belief, based on publicly reported information, more than a thousand such HHS waivers to date have been granted.

120.    Currently, Defendants are considering broadening the scope of the "religious entity" exemption further, in myriad ways.  26 CFR Part 54, 29 CFR Part 2590, 45 CFR Parts 147, 148 and 156 (Feb. 6, 2013).

121.    As shown by these exemptions, the ACA is creating a system of arbitrary and capricious individualized mandates, rather than an otherwise uniformly and generally applicable governmental mandate, because it allows highly discretionary and apparently irrational compliance waivers.

122.    The mandate is backed by heavy financial penalties.   Absent compliance, Plaintiffs will face ruinous enforcement actions, *see* 29 U.S. C. §1132 (a); a monetary penalty of $100 a day per employee, *see* 26 U.S. C. §4980D (a)-(b); and an annual tax surcharge of $2,000 per employee, *see id.* § 4980H. As potentially applied to Plaintiffs, these penalties are absolutely unsustainable and do and were intended to constitute existential threats to the continued existence of the company.

123. The Ozinga Bros. group health plan is due for renewal on the first of May, 2013.

124. Plaintiffs have been informed and reasonably believe that absent the relief prayed for herein, and upon renewal, Blue Cross/Blue Shield Illinois will have no choice but to include in Ozinga Bros.' plan coverage for abortion and abortifacient contraceptives, contrary to and in violation of Plaintiffs' sincerely held religious beliefs.

125. The Mandate seeks to control the decisions of employers, individuals and also the decisions of *all* insurance issuers (i.e. including Blue Cross/ Blue Shield Illinois) 42 U.S.C. § 300gg-13 (a) (1), (4). ("A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventative Services Task Force; . . . with respect to women, such additional preventative care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.").

126. On July 19, 2010, HHS, along with Defendants the Department of the Treasury and the Department of Labor, published an interim final rule under the Affordable Care Act. 75 Fed. Reg. 41726 (2010). The interim final rule required providers of group health insurance to cover "preventive care" for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date. 75 Fed. Reg. 41759 (2010).

127. On February 15, 2012, the United States Department of Health and Human Services promulgated a mandate that group health plans include coverage for all Food and Drug Administration-approved contraceptive methods and procedures, patient education, and counseling for all women with reproductive capacity in plan years beginning on or after August

1, 2012 (hereafter, "the Mandate"). *See*: 45 CFR § 147.130 (a)(1)(iv), as confirmed at 77 Fed. Register 8725 (Feb. 15, 2012), adopting and quoting Health Resources and Services Administration (HRSA) Guidelines, (http://www.hrsa.gov/womensguidelines).

128.    The Mandate was enacted pursuant to statutory authority under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, as amended by the Health Care and Education Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (ACA). 77 Fed. Reg. 31, 8725 ("Affordable Care Act").

129.    *All* insurance issuers are mandated to include as "preventative services" contraception, sterilization, abortion, and abortifacients such as the "morning after" pill," "Plan B," and "ella" in *all* of its group *and* individual plans, not specifically exempted, beginning as of August 1, 2012 and effective on the anniversary of the employer's plan year (here May 1, 2013).

130.    Individuals and employers, regardless of the number of employees they employ, will eventually be forced to select an insurance plan which includes what HHS deemed "preventative care."

131.    All individuals and employees will be stripped of their choice not to pay for the "preventative care," regardless of whether paying for such "services" violates one's conscience or deeply held religious beliefs.

132.    Health insurance issuers include insurance companies such as Blue Cross/Blue Shield of Illinois, which is the insurance issuer used by Plaintiffs.

133.    The Mandate reaches even further than the ACA to eliminate all employers and individuals from selecting a health insurance plan which the insurance issuers do not automatically provide contraception, and abortion and abortifacient contraception.

134.    HHS directed a private health policy organization, the Institute of Medicine

("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services should be covered by all health plans as preventative care for women. (http://www.hrsa.gov/womensguidelines).

135.    In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America and Sara Rosenbaum.[7]

136.    No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

137.    One year after the first interim final rule was published, on July 19, 2011, the IOM published its recommendations. It recommended that the preventative services include "All Food and Drug Administration approved contraceptive methods." (Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (July 19, 2011)).

138.    Preventative services therefore include FDA-approved contraceptive methods such as birth-control pills; prescription contraceptive devices, including IUDs; Plan B, also known as the "morning-after pill"; and ulipristal, also known as "ella" or the "week-after pill"; and other drugs, devices, and procedures.

139.    Plan B and "ella" can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo. The use of artificial means to prevent the

---

[7]  http://www.nap.edu/openbook.php?record_id=13181&PAGE=217.

implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law and Scriptural teaching. Consequently, Plan B and "ella" are abortifacients.

140. Thirteen days later, on August 1, 2011, without notice of rulemaking or opportunity for public comment, HHS, the United States Department of Labor, and the United States Department of Treasury adopted the IOM recommendations in full and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130. Health Resources and Services Administration issued guidelines adopting the IOM recommendations. (http://www.hrsa.gov/womensguidelines).

141. The Mandate also requires group health care plans and insurance issuers to provide education and counseling for all women beneficiaries with reproductive capacity.

142. The Mandate went into effect immediately as an "interim final rule."

143. HHS did not take into account the concerns of religious organizations in the comments submitted before the Mandate was issued.

144. Instead the Mandate was unresponsive to the concerns stated in the comments submitted by religious organizations.

145. When it issued the Mandate, HHS requested comments from the public by September 30, 2011 and indicated that comments would be available online.

146. Upon information and belief, over 100,000 comments were submitted against the Mandate.

147. The Mandate fails to take into account the statutory and constitutional conscience

rights of religious business owners and for profit companies that exercise business practices in compliance with certain faith practices, such as Plaintiffs' company Ozinga Bros.

148.    The Mandate requires that Plaintiffs assist, provide, or fund coverage for abortion, abortifacient contraception, and related education and counseling against its conscience in a manner that is contrary to law.

149.    The Mandate constitutes government-imposed pressure and coercion on Plaintiffs to change or violate their religious beliefs.

150.    The Mandate exposes Plaintiffs as individuals and as employers or companies with over 50 full-time employees, to substantial fines for refusal to change or violate their religious beliefs.

151.    The Mandate imposes a burden on Plaintiffs' employee recruitment efforts by creating uncertainty as to whether Plaintiffs will be able to offer health insurance beyond the beginning of their next plan year on May 1, 2013.

152.    The Mandate places Plaintiffs at a competitive disadvantage in their efforts to recruit and retain employees and members.

153.    The Mandate forces Plaintiffs to provide, fund, or approve and assist its employees and members in purchasing abortifacient drugs in violation of Plaintiffs' religious beliefs that doing so is gravely immoral and, in certain cases, equivalent to assisting another to destroy innocent human life.

154.    Plaintiffs have a sincere religious objection to providing coverage for emergency contraceptive drugs such as Plan B and "ella" since they believe those drugs could prevent a human embryo, which they understand to include a fertilized egg before it implants in the uterus, from implanting in the wall of the uterus, causing the death of a person.

155. Plaintiffs consider the prevention by artificial means of the implantation of a human embryo to be an abortion.

156. Plaintiffs believe that Plan B and "ella" can cause the death of the embryo, which is a person.

157. Plan B can prevent the implantation of a human embryo in the wall of the uterus.

158. "Ella" can prevent the implantation of a human embryo in the wall of the uterus.

159. Plan B and "ella" can cause the death of the embryo.

160. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law.

161. The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law.

162. The Mandate forces Plaintiffs to provide emergency contraception, including Plan B and "ella," free of charge, regardless of the ability of insured persons to obtain these drugs from other sources.

163. The Mandate forces Plaintiffs to fund education and counseling concerning abortion and abortifacient contraception that directly conflicts with Plaintiffs' religious beliefs and teachings.

164. Plaintiffs could not cease in providing its employees with health insurance coverage without violating their religious duty to provide for the health and well-being of its employees and their families. Additionally, employees would be unable to attain similar coverage in the market as it now exists.

165. The Mandate forces Plaintiffs to choose between violating their religious beliefs, incurring substantial fines, or terminating their employee or individual health insurance

coverage.

166.     Providing counseling and education about contraceptives, sterilization, and abortion directly undermines and subverts the explicit messages and speech of Plaintiffs.

167.     Group health plans and insurance issuers have been subject to the Mandate as of August 1, 2012.

168.     Plaintiffs plan year begins on May 1, 2013—and will be subject to the Mandate as of that date without Court intervention.

169.     Plaintiffs have already had to devote significant institutional resources, including both staff time and funds, to determine how to respond to the Mandate. Plaintiffs anticipate continuing to make such expenditures of time and money up until and after the time that the Mandate goes into effect for the Plaintiffs' plan.

170.     The Mandate indicates that the Health Resources and Services Administration ("HRSA") "may" grant religious exemptions to certain religious employers. 45 C.F.R. § 147.130(a)(iv)(A).

171.     The Mandate allows HRSA to grant exemptions for "religious employers" who "meet[ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in § 6033(a)(1) and § 6033(a) (3) (A) (i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a) (iv) (B).

172.     The Mandate imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the Mandate's definition of "religious

employers."

173.    HHS stated that it based the exemption on comments on the 2010 interim final rule. 76 Fed. Reg. 46621.

174.    There is no exemption for a for-profit company.

175.    Plaintiffs reasonably expect, as confirmed by their respective insurance issuers, that they will be subject to the Mandate despite the existence of exemptions to the Mandate as none of the exemptions apply to Plaintiffs.

176.    On January 20, 2012, Defendant Sebelius announced that there would be no change to the religious exemption. She added that "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law," on the condition that those employers certify they qualify for the extension.

177.    At the same time, however, Sebelius announced that HHS "intend[s] to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support." See Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius.[8] To date, Defendant HHS has not released any official rule implementing either the one-year extension or the additional forced-speech requirement that applies to either Plaintiff.

178.    It is inevitable with the current state of the law that Plaintiffs will have to comply with the Mandate, despite the fact that Plaintiffs will violate the teachings of their religious beliefs and the teachings of their Christian faith by directly providing, funding, and/or allowing its members to engage in disseminating information and guidance about where to obtain

---

[8]  http://www.hhs.gov/news/press/2012pres/01/20120120a.html

abortion, or abortifacient contraceptives

179.    Plaintiffs wish to renew coverage for their employees by purchasing an employee group insurance policy that excludes coverage for drugs and procedures to which they object as gravely wrong and sinful by reason of their sincerely held religious beliefs.

180.    Plaintiffs cannot provide benefits to their employees, consistent with their religious convictions, because the Mandate complained of requires that plaintiffs provide their employees with access to drugs and procedures that plaintiffs believe to be wrong and sinful.

181.    Consequently, the Mandate at issue force plaintiffs to provide their employees with coverage of those procedures that plaintiffs consider wrong and sinful.

182.    If subject to the Mandate, Plaintiffs are confronted with a vicious Hobson's choice: either comply with the Mandate's requirements in violation of their religious beliefs, or pay ruinous fines that would have a crippling impact on their business and force them to shut down.

183.    The Mandate challenged here does not advance a compelling government interest.

184.    The Mandate challenged here are neither narrowly tailored nor the least restrictive means available to advance any interests that the government may assert.

185.    The Mandates challenged here can be advanced by other means that are far more narrowly tailored and do not burden plaintiffs by requiring them to engage in conduct contrary to their religious convictions.

186.    Failure to comply with the Mandate subjects an employer to liability for fines.

187.    Failure to comply with the Mandate subjects an employer to liability for penalties.

188.    The federal Mandate has the force of law.

189.    No monetary damages could adequately compensate plaintiffs for depriving them

of their First Amendment Constitutional rights of Free Exercise and Free Speech, and to Due Process as a result of their being compelled to engage in conduct contrary to their religious and moral beliefs as traditionally has informed and guided their corporate practices. Thus an award of injunctive relief is necessary to avert and prevent plaintiffs from suffering immediate, grave, and ongoing illegal and irreparable harm.

190.    Absent declaratory and injunctive relief, plaintiffs will continue to suffer harm by reason of the federal and state mandates that force the plaintiffs to engage in conduct they believe to be gravely wrong and sinful by providing their employees with access to drugs and benefits to which the plaintiffs object by reason of their sincerely held religious convictions.

191.    Plaintiffs have filed suit because they do not wish to comply with this immoral mandate, which they believe to be illegal and unconstitutional, and must seek relief to escape the dilemma in which they find themselves.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Federal Religious Freedom Restoration Act ("RFRA")

192.    Plaintiffs incorporate by reference all of the preceding paragraphs.

193.    Plaintiffs' sincerely held religious beliefs prohibit them from providing or purchasing coverage for abortion or abortifacient contraception, or related education or counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

194.    The Mandate creates government imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

195.    The Mandate chills Plaintiffs' religious exercise.

196.    The Mandate exposes Plaintiffs to substantial competitive disadvantages, in that it

will no longer be permitted to offer or purchase health insurance.

197.    The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

198.    The Mandate furthers no compelling government interest.

199.    The Mandate is not narrowly tailored to any compelling government interest,

200.    The Mandate is not the least restrictive means of advancing the governmental interest.

201.    The Mandate and the Defendants' threatened enforcement of same violate rights secured to the plaintiffs by the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, et seq.

202.    Absent declaratory and injunctive relief, the plaintiffs will be greatly, illegally, and irreparably harmed.

## Count II

### Violation of First Amendment to the U.S. Constitution:
### <u>Free Exercise Clause</u>

203.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

204.    Plaintiffs' sincerely held religious beliefs prohibit them from providing coverage for contraception that is or potentially could be achieved by abortion, or related education or counseling.  Plaintiffs' compliance with these beliefs is a religious exercise.

205.    Neither the ACA nor the Mandate is neutral or generally applicable inasmuch as they are honeycombed with exceptions and waivers.

206.    Thus while the Mandate's applicability to plaintiffs entails a severe curtailment and suppression of the plaintiffs' rights to free and robust exercise of their religious faith, those organizations that fall within the federal exceptions or are granted waivers suffer no such curtailment or suppression of their rights.

207.    Defendants have created, and continue to create categorical exemptions and individual exemptions to the Mandate.

208.    The Mandate furthers no compelling government interest.

209.    The Mandate is not the least restrictive means of furthering the Defendants' stated interests.

210.    The Mandate creates government imposed coercive pressure on Plaintiffs to change or to violate their religious beliefs.

211.    The Mandate chills Plaintiffs' religious exercise.

212.    The Mandate exposes Plaintiffs to substantial fines for their religious exercise

213.    The Mandate is not narrowly tailored to any compelling governmental interest.

214.    The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured by the Free Exercise Clause of the First Amendment to the United States.

215.    The ACA and its implementing regulations require an intrusive inquiry into whether entities are "religious" enough to qualify for an exemption and defines religious practice in a limited sense that deprives citizens of their right to lead their lives in accordance with their religious convictions by purporting to dictate when, and under what circumstances, citizens can conduct their affairs consistent with their faith.

216.    The Mandate discriminates among religious believers by providing exemptions to some but not others based on the government's unduly narrow and crabbed concept of what it means to practice religion, contrary to the Free Exercise Clause of the First Amendment, and also based on the government's manifest preference for certain religious denominations, and the tenets they embrace, and its disfavor of other denominations, in violation of the Establishment

Clause of the First Amendment.

217.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will be greatly, illegally and irreparably harmed.

## Count III

### Violation of First Amendment to the U.S. Constitution:
### Free Exercise

218.    Plaintiffs incorporate by reference all preceding paragraphs.

219.    By design, Defendants imposed the Mandate on some religious organizations or religious individuals but not on others, resulting in discrimination among religions and religious beliefs.

220.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organization meeting the definition of "religious employers."

221.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organization meeting the definition of religious individuals.

222.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to them by the Free Exercise clause of the First Amendment of the Constitution of the United States.

223.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will be greatly, illegally and irreparably harmed.

## Count IV

### Violation of the First Amendment to the United States Constitution:
### Establishment

224.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

225.    By design, Defendants imposed the Mandate on some religious organizations but not on others, resulting in a selective burden on Plaintiffs.

226.    Defendants also imposed the Mandate on some religious individuals and religious organizations but not on others, resulting in a selective burden on Plaintiffs.

227.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all or no organizations meeting the definition of "religious employers."

228.    The Mandate also vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all or no individuals.

229.    The Mandate and Defendants' threatened enforcement of the Mandate therefore violates Plaintiffs' rights secured to them by the Establishment Clause of the First Amendment to the Constitution of the United States.

230.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will be greatly, illegally and irreparably harmed.

## Count V

### Violation of the First Amendment to the United States Constitution: <u>Free Speech</u>

231.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

232.    Plaintiffs profess, educate, lecture and engage in outreach amongst the community that abortion and abortifacients are violations of their religious beliefs.

233.    The Mandate would compel Plaintiffs to fund and to provide education and counseling related to contraception, sterilization, abortion and abortifacients.

234.    Defendants' actions thus violate Plaintiffs' right to be free from compelled speech as secured to them by the First Amendment of the Constitution of the United States.

235.    The Mandate's compelled speech requirement is not narrowly tailored to a compelling government interest.

236.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will be greatly, illegally and irreparably harmed.

## Count VI

### Violation of the First Amendment of the United States Constitution:
### Expressive Association

237.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

238.    Plaintiffs profess, educate, lecture and engage in outreach amongst the community that abortion and abortifacients are violations of their religious beliefs.

239.    The Mandate would compel Plaintiffs to subsidize activities that Plaintiffs profess, educate, and engage in outreach in the community are violations of Plaintiffs' religious beliefs.

240.    The Mandate would compel Plaintiffs to fund and to provide education and counseling related abortion and abortifacients.

241.    Defendants' actions thus violate Plaintiffs' right of expressive association as secured to them by the First Amendment of the Constitution of the united States.

242.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will be greatly, illegally and irreparably harmed.

## Count VII

### Violation of the First Amendment of the United States Constitution:
### Free Exercise  and Freedom of Speech

243.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

244.    By stating that the HRSA "may" grant an exemption to certain religious groups,

the Mandate vests HRSA with unbridled discretion over which organizations or individuals can have their First Amendment interests accommodated.

245.    The Mandate fails to address the constitutional and statutory implications of the Mandate on for-profit employers such as Plaintiffs and Ozinga Bros., Inc., such that and as a result Plaintiffs are subject to the unbridled discretion of the HRSA to determine whether such companies would be exempt or are wholly left without relief from the Mandate

246.    Defendants' actions violate Plaintiffs right not to be subject to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the Constitution of the United States.

247.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will be greatly, illegally and irreparably harmed.

### Count VIII

### Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706

248.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

249.    The Mandate/Final Rule is contrary to section 1303(b)(1)(A) of Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148 § 1303, 124 Stat. 119, 168 (to be codified at 42 U.S.C. §18023(b)(1)(A)), which provides that "nothing in this title . . . shall be construed to require a qualified health plan to provide coverage of [abortion] procedures . . . as part of its essential health benefits for any plan year."

250.    The federal Mandate requires provision of abortifacients, drugs that will result in abortions, contrary to this statutory section.

251.    The Mandate/Final Rule is thus contrary to existing law, and therefore it should be judicially reviewed and declared void, pursuant to the 5 U.S.C. §706(2), as arbitrary,

capricious, an abuse of discretion, and not in accordance with law, and in excess of statutory jurisdiction, authority, limitations, or short of statutory right.

252. The Mandate/Final Rule should also be struck down as having been promulgated without observance of procedure required by law, namely, 5 U.S.C. §553, in that no notice or comment period was provided before the federal defendants promulgated said Mandate/Final Rule, as legally required. Defendants disregarded and dispensed with these procedural protections requiring notice and comment on the part of interested parties without legally sufficient cause.

253. Defendants' stated reasons that public comments were unnecessary, impractical and opposed to the public interest are false and insufficient, and do not constitute "good cause."

254. Without proper notice and opportunity for public comment, Defendants were unable to take into any account, much less full account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented."

255. Defendant did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

256. Defendants in effect delegated their rule making authority to a non-governmental organization so as to circumvent the APA and in violation of the Act.

257. Defendants acted in an arbitrary and capricious manner, furthermore, when they ignored comments indicating that abortion and abortifacient contraceptives, as well as counseling and education for these procedures, could not reasonably be viewed as preventative care.

258. For these reasons among others, Defendants have taken agency action not in observance with procedures required by law, and the Defendants' actions should be set aside, pursuant to 5 U.S.C. §706(2).

259.     Absent injunctive and declaratory relief against the Mandate/Final Rule, plaintiffs have been and will continue to be greatly, irreparably and illegally harmed.

## Count IX

### Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706

260.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

261.     In promulgating the Mandate, defendants failed to consider the constitutional and statutory implications of the Mandate on Plaintiffs and similarly situated organizations, companies and individuals.

262.     Defendants' explanations for its decision not to exempt Plaintiffs and similar companies and religious individuals runs counter to the evidence submitted by religious organizations during the comment period.

263.     Defendants' issuance of the interim final rules was arbitrary and capricious within the meaning of 5 U.S.C. §706 (2) (A) because the rules fail to consider the full extent of the implications and they do not take into consideration the evidence against them.

264.     Absent injunctive and declaratory relief against the Mandate/Final Rule, plaintiffs have been and will continue to be greatly, irreparably and illegally harmed.

## Count X

### Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706

265.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

266.     The Mandate is contrary to the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, public Law 110 329, Div. A., Sec. 101, 122 Stats. 3574, 3575 (September 30, 2008).

267.     The Weldon Amendment provides that "[n]one of the funds made available in this

Act [making appropriations for Defendants United States Department of Labor and United States Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

268.　　The Mandate requires issuers, employers, and individuals, including Plaintiffs, to provide and purchase coverage for al Federal Drug Administration-approved contraceptives.

269.　　Some FDA-approved contraceptives cause abortions.

270.　　As set forth above, the Mandate violates RFRA and the First Amendment.

271.　　Under 5 U.S.C. 706 (2) (A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

272.　　Absent injunctive and declaratory relief against the Mandate/Final Rule, plaintiffs have been and will continue to be greatly, irreparably and illegally harmed.

**Count XII**

**Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706**

273.　　Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

274.　　The Mandate is contrary to the provisions of the Affordable Care Act.

275.　　Section 1303 (a) (1) (A) (i) of the ACA states that "nothing in this title"—Title I of the Act, including provisions dealing with "preventative services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services. . . as part of its essential health benefits for any plan year."

276.　　Section 1303 further states that it is the "issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion procedures.

277.     Under the ACA, Defendants do not have authority to decide whether a plan covers abortion; only the issuer does.

278.     However, the Mandate requires all issuers, including Plaintiffs and Plaintiffs insurance issuer Blue Cross/Blue Shield of Illinois to provide coverage of all Federal Drug Administration-approved contraceptives.

279.     Some FDA approved contraceptives cause abortions.

280.     Under 5 U.S.C. § 706 (2) (A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

281.     Absent injunctive and declaratory relief against the Mandate/Final Rule, plaintiffs have been and will continue to be greatly, irreparably and illegally harmed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that the Court:

a.     Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violate and infringe upon the Plaintiffs' First Amendment rights under the Constitution of the United States;

b.     Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the Religious Freedom Restoration Act;

c.     Declare that the Mandate was issued in violation of the Administrative Procedure Act.;

d.     Issue both a preliminary and a permanent injunction prohibiting and enjoining Defendants from enforcing the Mandate against Plaintiffs and other religious individuals, employees, and companies that object to funding and providing insurance coverage for abortion and abortifacients, and related education and counseling; and

     e.      Award plaintiffs the costs of this action, reasonable attorneys fees, and such other

relief as the Court deems just and proper.

Submitted this May 1, 2013.

s/ Thomas Brejcha
s/ Peter Breen
*Attorneys for Plaintiffs*

Of Counsel:

Thomas Brejcha
Peter Breen
THOMAS MORE SOCIETY
29 South LaSalle St. – Suite 440
Chicago, IL 60603
Tel. 312-782-1680
Fax 312-782-1887

Sam Casey
Managing Director & General Counsel
JUBILEE CAMPAIGN USA – LAW OF LIFE PROJECT
9689-C Main Street
Fairfax, VA 22031 USA
Tel. 202-587-5652 or 703-503-0791

Kevin Edward White
KEVIN EDWARD WHITE & ASSOCIATES
77 West Wacker Drive, Suite 4800
Chicago, IL 60601-2010
Tel. 312-606-8602
Fax: 312-606-8603

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, one of plaintiffs' counsel, hereby certify that on this May 1, 2013, a true and correct copy of the foregoing was caused to be filed electronically with this Court through the CM/ECF filing system and that I mailed a copy of the foregoing complaint by placing same in a sealed envelope, together with the requisite waiver forms, and properly addressing same to the following persons, affixing proper first class postage prepaid thereto, and depositing same in the U.S. mail chute at 29 South LaSalle St., Suite 440, Chicago, IL 60603:

Civil Process Clerk
UNITED STATES ATTORNEY'S OFFICE
Northern District of Illinois, Eastern Division
219 S. Dearborn St., 5th Floor
Chicago, IL 60604

Eric H. Holder, Jr.
U.S. Attorney General
U. S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jacob J. Lew
U.S. DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Kathleen Sebelius
U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201

Seth D. Harris, Deputy Secretary of
Labor, in his official capacity as
Acting Secretary of the U.S.
Department of Labor
U.S. DEPARTMENT OF LABOR
200 Constitution Ave. NW
Washington, DC 20210

By: _____

Of Counsel:

Thomas Brejcha
Peter Been
THOMAS MORE SOCIETY
29 South LaSalle St. – Suite 440
Chicago, IL 60603
Tel. 312-782-1680
Fax 312-782-1887

Sam Casey
Managing Director & General Counsel
JUBILEE CAMPAIGN USA – LAW OF LIFE PROJECT
9689-C Main Street
Fairfax, VA 22031 USA

Tel. 202-587-5652

Kevin Edward White
KEVIN EDWARD WHITE & ASSOCIATES
77 West Wacker Drive, Suite 4800
Chicago, IL 60601-2010
Tel. 312-606-8602
Fax: 312-606-8603